# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00028-CV

**J. Scott Loras, Appellant**

**v.**

**Susan Mitchell, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. D-1-FM-10-001499, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The trial court ordered J. Scott Loras to reimburse his former wife, Susan Mitchell, for expenses she incurred to send their son to an outdoor therapeutic program and then to a residential treatment facility, both of which were for the purpose of addressing his mental-health and behavioral issues. On appeal, Loras asserts that the trial court abused its discretion in issuing the child-support enforcement order because (1) the evidence is insufficient to establish that the expenses are "health-care" expenses within the meaning of the parties' amended divorce decree or as contemplated by the Texas Family Code, (2) the expenses were incurred in a non-emergency situation without his consent, and (3) he is entitled to an offset for other child support he paid to Mitchell during the time their son was enrolled in the treatment programs. We will affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Loras and Mitchell were divorced in 1997. Their final divorce decree appointed both parents as joint managing conservators for their son, A.L. Among other things, the decree specified that both parents retained the right to (1) consent to medical treatment during an emergency involving an immediate danger to the health and safety of the child and (2) consent on behalf of the child to medical treatment involving psychiatric and psychological treatment. The decree also included fairly restrictive provisions regarding reimbursement of uninsured health-care expenses incurred on A.L.'s behalf for psychiatric and psychological treatment. Those provisions required each party to pay 50% of such expenses for A.L. for three months after the date of the divorce decree; thereafter, each parent was to pay 100% of the expenses for psychiatric and psychological treatment authorized by that parent.

In May 2007, however, following A.L.'s inpatient treatment at a Texas-based residential treatment facility for psychological issues, Loras and Mitchell executed an agreed order that modified the health-care provisions in the divorce decree ("Agreed Order"). The Agreed Order included the following relevant provisions:

1.      Definitions—

. . . .

"Reasonable and necessary health-care expenses not paid by insurance and incurred by or on behalf of a child" include, without limitation . . . mental health-care services.

. . . .

5. Compliance with Insurance Company Requirements— . . . Each party shall attempt to use "preferred providers," or services within the health maintenance organization, if applicable; however, this provision shall not apply if emergency care is required or agreement between the parties. Disallowance of the bill by a health insurer shall not excuse the obligation of either party to make payment as allocated herein.

. . . .

8. Health-Care Expenses Not Paid by Insurance—Subject to the provisions in paragraph 5, immediately above, IT IS ORDERED that, if health-care expenses are incurred for the child, [Loras] and [Mitchell] shall pay all reasonable and necessary health-care expenses not paid by insurance and incurred by or on behalf of the child in the following portions:

a. If the health-care expenses are incurred by using a HMO or PPO plan, in an emergency, or with the written agreement of the other party, [Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent.

b. Except in an emergency or if the other parent agreed in writing, if a party incurs health-care expenses for the child by using the services of health-care providers not employed by the HMO or approved by the PPO, [Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent.[1]

The Agreed Order further specified that the "reasonableness of the charges for health-care expenses shall be presumed when a party is furnished with the applicable documents for the charges."

In November 2007, after A.L. exhibited violent and destructive behavior and made an outcry for assistance, Mitchell informed Loras, via email, that A.L.'s condition was rapidly

---

[1] Paragraph 8 of the Agreed Order specified three additional scenarios in which health-care expenses not covered by insurance must be apportioned between the parties, none of which is alleged to be applicable in this case and all of which similarly require a 50/50 split between Loras and Mitchell.

3

deteriorating. Loras responded that A.L. needed to leave his mother's home "ASAP." Loras was apparently unable or unwilling to take custody of A.L. at that time, however, and Mitchell's husband informed Loras that they would keep him posted on "when, where, and what" they would do with A.L. About ten days after Mitchell's initial communication with Loras, she enrolled A.L. in Outback Therapeutic Expeditions, a nine-week outdoor therapeutic camp in Utah, which Loras concedes on appeal was an "intensely therapeutic" program with "well-defined health care elements." Loras participated in A.L.'s therapy sessions at Outback—both in person and by telephone—and never sought to withdraw him from the program or requested that he be withdrawn.

Upon completion of the Outback wilderness program in January 2008, A.L.'s therapist informed Mitchell that A.L. should not return home and should instead be enrolled in a residential treatment facility. Mitchell communicated this information to Loras, along with a list of six prospective facilities, as Loras had previously communicated a willingness to consider placing A.L. in a boarding school. Loras was invited to join Mitchell in visiting the treatment centers, but he did not respond to Mitchell's email. She subsequently informed him that A.L. had been accepted at Discovery Ranch, a residential treatment facility in Utah. While A.L. was being treated at Discovery Ranch from January 2008 until he graduated high school in December 2008, Loras participated in A.L.'s therapy sessions—both in person and by telephone—and never sought to withdraw him from the program or requested that he be withdrawn. In addition, it is undisputed that Loras repeatedly encouraged A.L. to stay at Discovery Ranch for several months after he attained the age of majority and could have withdrawn himself from the program.

4

Although Mitchell regularly submitted invoices to Loras and requested that he reimburse her for 50% of the expenses, Loras never reimbursed Mitchell for any expenses incurred for A.L.'s treatment at Outback or Discovery Ranch. As a result, in April 2009, Mitchell initiated the underlying post-divorce enforcement action regarding expenses incurred for their son's enrollment in these programs. After a bench trial, the trial court granted Mitchell's request for enforcement of the Agreed Order and rendered judgment against Loras for $78,659.75 in health-care related, child-support arrearages and $11,312.87 in attorney's fees.

On appeal, Loras presents five issues in which he asserts that the trial court abused its discretion in rendering judgment against him.

**STANDARD OF REVIEW**

"'A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion.'" *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). "A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or principles." *Id*. "A trial court also abuses its discretion by failing to analyze or apply the law correctly." *Id*.

Under an abuse-of-discretion standard, legal and factual sufficiency of the evidence are relevant factors in assessing whether the trial court abused its discretion, but they are not independent grounds of error. *Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011). Accordingly, in determining whether the trial court abused its discretion in this case, we apply a two-pronged analysis. *See id*. First, we must consider whether

5

the trial court had sufficient information on which to exercise its discretion. *Id.* Second, we must determine whether, based on the evidence, the trial court's decision was reasonable. *Id*.

In determining whether there is legally sufficient evidence to support a finding under review, we examine the record for evidence and inferences that support the challenged finding, considering evidence favorable to the finding if a reasonable factfinder could and disregarding evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827-28 (Tex. 2005). Evidence is legally insufficient only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). We will not substitute our judgment for that of the factfinder if the evidence falls within the zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822.

Evidence is factually insufficient only if the evidence adverse to the finding at issue preponderates so overwhelmingly against the challenged finding that the finding is clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

As the factfinder in this case, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). There is no abuse of discretion if some probative and substantive evidence supports the trial court's order. *See, e.g.*, *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied).

6

**DISCUSSION**

*Health-Care Expenses*

In his first and fifth issues, Loras asserts that the trial court abused its discretion in concluding that the entire cost for Outback and Discovery Ranch qualifies as a health-care expense. He contends that the evidence was insufficient to establish that the expenses incurred on A.L.'s behalf at Discovery Ranch were health-care expenses because the invoices from Discovery Ranch refer to "tuition" and do not include itemized medical-care expenses. Loras contends that Discovery Ranch is a "boarding school" and that neither the Agreed Order nor the Texas Family Code requires the court to charge boarding school tuition as a medical support obligation. In the alternative, he contends that there is insufficient evidence to determine what portion of the expenses incurred at Outback and Discovery Ranch are health-care expenses because the total cost of care for A.L. included non-health-care components, such as tuition, room and board, and other educational costs, that were not segregated from legitimate health-care expenses.

Under the Agreed Order, "mental health-care services" are included within the definition of reimbursable health-care expenses. In *Rambo v. Rambo*, we previously held that expenses for an outdoor therapeutic program and a residential treatment center for a troubled teen were health-care expenses. No. 03-01-00257-CV, 2002 WL 24033, at *3 (Tex. App.—Austin Jan. 10, 2002, no pet.) (mem. op., not designated for publication) (holding that sufficient evidence supported finding that outdoor therapy program and residential treatment expenses were health-care expenses not covered by insurance, for which father was required to pay 50% pursuant to divorce decree).

7

The factual circumstances in *Rambo* are similar to those in the present case regarding the child's need for the services and the types of services rendered. As in *Rambo*, there is undisputed testimony that A.L. was an emotionally troubled teen. At age seventeen, A.L. was combative, behaving violently, and using drugs, alcohol, and tobacco. He had previously been diagnosed with intermittent rage disorder, severe depression, and attention-deficit hyperactivity disorder. Even after a previous stint in residential treatment in the spring of 2007, A.L.'s problems persisted and escalated to the point that his mother and stepfather were fearful that A.L. would harm them. There was undisputed evidence that A.L. had destroyed property, had a 10-inch military knife hidden in his room, had injured his stepfather by throwing a rock at his head, had beaten his mother with a broomstick, had threatened his grandmother with a dowel rod, and had previously thrown a butcher knife at his stepfather. There were other disturbing incidents. Mitchell was so fearful of her son's erratic behavior that she hired an off-duty sheriff's deputy to stay at her home when her husband traveled.

During this time, A.L. was attending outpatient therapy, and his psychiatrist and psychologist recommended that A.L. be enrolled in a residential treatment facility. A.L.'s psychologist contacted Loras several times to discuss this option, but Mitchell testified that, as far as she knew, Loras never met with A.L.'s psychologist to discuss the matter. However, Loras informed Mitchell on several occasions that he was having financial difficulties, that he wanted to reduce counseling expenditures for his son, and that his consent was required for A.L.'s health-care treatment.

On November 3, 2007, A.L. was particularly out of control, destroying property and choking Mitchell. Mitchell promptly informed Loras of these circumstances by email and told him that A.L. had begged her for help, stating "Mom, please help me . . . I'm losing my mind . . . mom, I'm absolutely losing my mind." Loras quickly responded via email that A.L. needed to leave his mother's home "ASAP." Loras testified that he intended for A.L. to come live with him. However, he never came to collect his son, and other evidence admitted at trial indicates that Loras expressed an inability or unwillingness to take custody of A.L. for several months, if then. Consequently, Mitchell and her husband testified that they were left to seek alternative placements for A.L. Mitchell's husband specifically informed Loras via email that they would be looking into other placements and would let Loras know where A.L. would be placed. Loras did not respond. On November 13, 2007, A.L. was enrolled in Outback to address the immediate crisis and to facilitate his later enrollment in a residential treatment facility. On the same day, the Mitchells informed Loras of this enrollment, and Loras did not communicate any objections or reservations to them at that time.

The record reflects that, at Outback, A.L. received medical and psychological services under the direction of a physician—including a psychological evaluation, regular counseling, lab work, drug screening, physical assessments, and prescription medications—and engaged in intensive therapeutic activities. Loras participated in A.L.'s therapy sessions at Outback and at no time sought to withdraw him from the program or requested that he be withdrawn. Shortly before A.L.'s discharge from Outback in January 2008, however, Loras informed Mitchell via email that he would not pay for any expenses incurred for A.L.'s enrollment at Outback because she had not obtained his

9

prior approval and consent. Loras now concedes that at the time A.L. was enrolled at Outback, he needed acute care in a highly controlled environment, at least for a short while. Loras acknowledges that A.L.'s treatment at Outback included significant health-care components, in addition to schooling and room and board.

Prior to A.L.'s discharge from Outback, his therapists advised that further intensive treatment was essential to his recovery. His psychologist stated that he had "no business" returning home and "under no circumstances" should he return home at that time. It was recommended that A.L. be placed in a residential treatment center. Mitchell and Loras exchanged various emails regarding further placements for A.L., and Mitchell forwarded Loras a list of potential placements. She later informed him that only three of the treatment centers would accept A.L. and invited Loras to participate in the selection process. Loras failed to respond to Mitchell and did not offer any input on the available opportunities. Although Loras testified that he suggested that A.L. could live with him and go to school in Austin, the documentary evidence introduced at trial indicates that this offer was made before A.L.'s enrollment at Outback, and there is no evidence that Loras renewed this offer when A.L.'s post-Outback placement was being considered, suggested any other placements for A.L., or made any effort to investigate the possibility of A.L.'s enrollment elsewhere.

After receiving no response from Loras, Mitchell informed Loras that A.L. had been accepted into Discovery Ranch and would be enrolled there upon his discharge from Outback. Despite Loras's characterization of Discovery Ranch as a "boarding school," the evidence established that Discovery Ranch was a licensed residential treatment facility that provided regular counseling to A.L. (individual, group, and family counseling) and a comprehensive therapeutic

10

environment. Loras regularly participated in A.L.'s therapy sessions, and he neither attempted to withdraw him from the program nor asked that he be withdrawn. Indeed, it is undisputed that Loras encouraged A.L. to remain enrolled at Discovery Ranch when A.L. suggested withdrawing from the program. Loras testified that he availed himself of the psychological services offered at Discovery Ranch and was amenable to A.L.'s treatment there but did not want to pay for it because he believed the costs to be beyond his financial means.

Following his discharge from Discovery Ranch, A.L. was successfully enrolled in college and now lives with his father when he is not in school. Mitchell testified that she believes her son would likely have ended up in jail had he not received treatment at Outback and Discovery Ranch. Mitchell's husband testified that A.L. would likely have ended up in jail or a state home for psychiatric care. Loras testified that he had harbored doubts about whether A.L. could become a productive adult if he was unable to control his anger.

There is sufficient evidence in the record that Outback and Discovery Ranch are intensive, inpatient therapeutic programs that provided mental health-care services to A.L., including regular counseling and therapy sessions and an environment fully integrating therapeutic goals for A.L. Moreover, there is no evidence that the expenses were incurred for any purpose other than to address A.L.'s mental-health issues. Therefore, we conclude that the trial court did not abuse its discretion in determining that the expenses for these services qualify as health-care expenses, regardless of whether there are distinct elements of care that, standing in isolation, might not otherwise independently qualify as mental health-care services. *Cf. Rambo*, 2002 WL 24033, at *2 (rejecting father's argument that evidence was insufficient to establish that residential treatment

11

center provided psychological, physical or health-care services rather than private school). We overrule Loras's first and fifth issues.

### *Requirement of Consent to Treatment or Emergency Circumstances*

In his second and third issues, Loras contends that, even if the expenses incurred at Outback and Discovery Ranch qualify as reimbursable health-care expenses, he is not responsible for his proportionate share of the expenses because the divorce decree requires the parents' joint consent to any medical treatment and the Agreed Order requires the use of providers covered by insurance, except in emergency circumstances or by agreement of the parties. It is undisputed that Mitchell failed to use insurance-approved providers, and Loras contends that he did not consent to A.L.'s treatment and that the evidence is insufficient to establish that an "emergency" existed. Because we conclude that the evidence is sufficient to support a finding that Loras effectively consented to A.L.'s treatment at Outback and Discovery Ranch, we do not reach the issue of whether the circumstances present an "emergency" within the meaning of the Agreed Order.

Loras contends that his consent to treatment is required based on (1) two related provisions in the Agreed Order—paragraph 5 and subparagraph 8(b)—and (2) the provisions in the divorce decree appointing both parents as joint managing conservators with the right to consent to A.L.'s medical treatment and to consent on A.L.'s behalf to medical treatment involving psychiatric and psychological treatment.[2] Paragraph 5 of the Agreed Order provides:

---

[2] Loras's and Mitchell's rights and duties as joint managing conservators are set out in the divorce decree as follows:

IT IS ORDERED that the parents, as Joint Managing Conservators, shall each retain

12

5. Compliance with Insurance Company Requirements—... Each party shall *attempt* to use 'preferred providers,' or services within the health maintenance organization, if applicable; however *this provision shall not apply if emergency care is required or agreement between the parties*.

---

the right at all times to receive information from the other concerning the health, education, and welfare of the child and to the extent possible to confer with the other party prior to a decision being made concerning the health, education and welfare of the child.

IT IS FURTHER ORDERED that each party shall have the duty to inform the other parent in a timely manner of significant information concerning the health, education and welfare of the child.

Each party is ORDERED and DECREED to inform the other party as soon as possible, but in no instance no more than 4 hours of any medical condition of the parties' child requiring surgical intervention and/or hospitalization.

. . . .

Rights of the Parents at all times. IT IS ORDERED and DECREED that at all times the parents, as Joint Managing Conservators, shall each retain the following rights:

. . . .

6. to consent to medical . . . treatment during an emergency involving an immediate danger to the health and safety of the child;

7. to consent for the child to medical . . . treatment involving invasive procedures and for psychiatric and psychological treatment;

8. to consent for the child to medical . . . care not involving an invasive procedure; . . .

13

(Emphases added.) The trial court determined that the use of the word "attempt" in this paragraph made the use of "preferred providers" or providers employed by a health maintenance organization discretionary. We hold that the trial court's interpretation of this provision is not unreasonable.

Even if the requirement were not discretionary, however, the trial court did not abuse its discretion in concluding that the exception based on the parties' agreement was satisfied because Loras implicitly or explicitly consented to A.L.'s treatment at Outback and Discovery Ranch. There is sufficient evidence in the record that Loras (1) was informed that A.L. needed immediate intervention, (2) agreed with A.L.'s removal from his home and did not suggest an immediate alternative placement, (3) was promptly advised about A.L.'s placement at Outback and was provided information about the program, (4) was advised of A.L.'s prospective enrollment at Discovery Ranch and actual enrollment, (5) did not withdraw or seek to withdraw A.L. from either program or ask that he be withdrawn from either program, and (6) participated in both programs with A.L. and repeatedly encouraged A.L. not to withdraw from Discovery Ranch. Whether characterized as consent, ratification, or estoppel from denying lack of consent, the trial court did not abuse its discretion in concluding that Loras consented to A.L.'s treatment at Outback and Discovery Ranch to the extent consent is required under paragraph 5 of the Agreed Order or the final divorce decree.

Loras also contends that we must construe subparagraph 8(b) of the Agreed Order to require an emergency or written agreement before he is obligated to pay 50% of A.L.'s health-care expenses. He asserts that any other construction would render subparagraph 8(b)'s provisions meaningless when that subparagraph is construed together with subparagraph 8(a). In essence, Loras contends that because both subparagraphs (a) and (b) require a 50/50 apportionment of expenses,

14

those paragraphs would lack distinctive meaning unless subparagraph (b) is read to require an emergency or a written agreement as a condition to his obligation to contribute. We disagree. Aside from the fact that subparagraph 8(b) explicitly applies without regard to an emergency or agreement of the parties, the paragraphs apply to different situations and thus have meaning without adding the limitations Loras suggests.

Paragraph 8 of the Agreed Order provides, in relevant part, as follows:

8.    Health-Care Expenses Not Paid by Insurance—Subject to the provisions in paragraph 5, immediately above, IT IS ORDERED that, if health-care expenses are incurred for the child, [Loras] and [Mitchell] shall pay all reasonable and necessary health-care expenses not paid by insurance and incurred by or on behalf of the child in the following portions:

    a.    If the health-care expenses are incurred by using a HMO or PPO plan, in an emergency, or with the written agreement of the other party, [Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent.

    b.    Except in an emergency or if the other parent agreed in writing, if a party incurs health-care expenses for the child by using the services of health-care providers not employed by the HMO or approved by the PPO, [Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent.

    c.    If [Loras] provides health insurance for the child through an HMO or a PPO that does not provide coverage for the child where the child resides or have network providers in the area where the child resides,[Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent.

    d.    If the child is enrolled in a health-care plan that is not an HMO or a PPO, [Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent.

e.	If the child was enrolled in a medical assistance program [under state law] and is no longer eligible for coverage in that plan or program, [Loras] is ORDERED to pay fifty (50%) percent and [Mitchell] is ORDERED to pay fifty (50%) percent until health insurance is provided for the child or the child is again eligible for enrollment [in the applicable state health-care plans].

Subparagraph (a) requires a 50/50 split if non-covered health-care expenses are incurred using covered providers, in an emergency, or with the parties' written agreement. Subparagraph (b) requires a 50/50 split if non-covered health-care expenses are incurred because the parties used a provider not covered by the plan. We do not perceive an ambiguity or irreconcilable conflict in these provisions merely because they would effectively require a 50/50 split of health-care expenses in most, if not all, cases and because there might be some overlap in their application. The clear intent of paragraph 8 is to provide equal apportionment of health-care expenses not covered by insurance in most, if not all, scenarios. This is evidenced not only by the breadth of subparagraphs (a) and (b) but also by the inclusion of subparagraphs (c), (d), and (e), which similarly provide for an equal apportionment of non-covered expenses. An unambiguous contract is construed according to the plain meaning of its express wording. *See, e.g.*, *Feiss v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction."). The Agreed Order does not require written consent as a prerequisite to apportionment of expenses under subparagraph 8(b). Indeed, the existence of a written agreement between the parties is an *exception* to the application of subparagraph 8(b). And to the extent consent is required under paragraph 5, to which the apportionment provisions are

16

subject, we have already concluded that the trial court did not abuse its discretion in determining that Loras consented to A.L.'s treatment at Outback and Discovery Ranch. Loras's second and third issues are therefore overruled.

### *Offset for Non-Health-Care Child-Support Payments*

In his fourth issue, Loras contends that the trial court abused its discretion by failing to offset the amounts Loras paid to Mitchell for child support while A.L. was being treated at Outback and Discovery Ranch. Loras did not plead offset, however. "The right of offset is an affirmative defense. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion." *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980); *see also* Tex. Fam. Code Ann. § 157.008(d) (West 2008) ("An obligor who has provided actual support to the child during a time subject to an affirmative defense under this section may request reimbursement for that support as a counterclaim or offset against the claim of the obligee."); Tex. R. Civ. P. 94 ("[A] party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense."). Loras failed to plead offset as a defense in the underlying action; therefore, the point is waived. We overrule Loras's fourth issue.

### CONCLUSION

We hold that the trial court did not abuse its discretion in determining that (1) the expenses incurred on A.L.'s behalf at Outback and Discovery Ranch are fully reimbursable health-care expenses, (2) use of covered providers is discretionary under the terms of the Agreed Order, (3) Loras tacitly or explicitly consented to A.L.'s treatment at Outback and Discovery Ranch,

17

and (4) Loras waived his claim for an offset. For these reasons, the trial court's judgment is affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   July 12, 2012